# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Dangelo L. Lockhart,                                    Civ. No. 16–3612 (BRT)

       Plaintiff,

v.                                                      **MEMORANDUM**
**OPINION AND ORDER**

Nancy A. Berryhill,
Acting Commissioner of
Social Security,

       Defendant.

James H. Greeman, Esq., Greeman Toomey, counsel for Plaintiff.

Ann M. Bildsten, Esq., United States Attorney's Office, counsel for Defendant.

BECKY R. THORSON, United States Magistrate Judge.

       Pursuant to 42 U.S.C. § 405(g), Plaintiff Dangelo L. Lockhart seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner") denying his application for disability insurance benefits. This matter is before the Court on the parties' cross–motions for summary judgment, in accordance with D. Minn. LR 7.2(c)(1). (Doc. Nos. 11, 15.) For the reasons stated below, the Court concludes that the Administrative Law Judge's ("ALJ") decision is supported by substantial evidence in the record. Therefore, Plaintiff's motion is denied and Defendant's motion is granted.

# BACKGROUND

## I.    Procedural History

Plaintiff filed an application for disability insurance benefits ("DIB") on April 4, 2013, alleging a disability onset date of November 6, 2012. (Tr. 18, 37.)[1] The Social Security Administration ("SSA") denied his claim initially on November 19, 2013, and on reconsideration on April 21, 2014. (Tr. 18, 109–10, 118.) A video hearing was then held by an ALJ on May 28, 2015. (Tr. 18, 35, 37.) After the video hearing, Plaintiff submitted additional medical evidence, which was reviewed and added to the record. (Tr. 18, 609–19.) The ALJ issued a decision denying benefits on October 8, 2015 (Tr. 18–29), and Plaintiff sought review. The SSA Appeals Council denied Plaintiff's request for review on August 26, 2016, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–5); 20 C.F.R. § 404.981.

On October 25, 2016, Plaintiff filed this action seeking judicial review pursuant to 42 U.S.C. § 405(g). (Doc. No. 1, Compl.) The parties then filed cross–motions for summary judgment, pursuant to the Local Rules. (Doc. Nos. 11, 15.) In Plaintiff's motion, he argues that the ALJ erred at step three of the disability evaluation analysis by finding that Plaintiff's assessed full scale IQ score of 48 given by a consultative examiner was invalid; instead, Plaintiff asserts that the score was valid and he is presumptively disabled pursuant to 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.05(b) – Intellectual Disability. (Doc. No. 13, Pl.'s Mem. Supp. Mot. Summ. J. ("Pl.'s Mem.") 11–12, 18–19.)

---

[1]    Throughout this Opinion and Order, the abbreviation "Tr." is used to reference the Administrative Record. (Doc. No. 9.)

Plaintiff also argues that the ALJ erred at step two of the analysis by failing to identify four additional severe impairments diagnosed during the same consultative examination. (Pl.'s Mem. 12, 26–27.) Defendant argues that the ALJ properly assigned little weight to the opinion of the consultative examiner, which included the assessed full scale IQ score, because the opinion was based on a one–time evaluation and was inconsistent with the record as a whole. (Doc. No. 16, Def.'s Mem. Supp. Mot. Summ. J ("Def.'s Mem.") 5–8, 14.)

## II.    Factual Background

Plaintiff grew up in Mississippi where he attended school until the ninth or tenth grade. (Tr. 55, 464–65, 610.) Plaintiff reported that he was an A, B, and C student while in school (Tr. 389), and he testified at his video hearing that he did not receive any special help in school. (Tr. 55.) The record, however, references that he attended special education classes from 2000 to 2002. (Tr. 209.) He admitted to his medical provider that he had "learning problems." (Tr. 465.) But at his video hearing, Plaintiff reported that he stopped attending school because he "knew everything." (Tr. 55.)

Plaintiff's work history is varied. (Tr. 39–40, 47, 209, 217.) In 2006, he worked as a dishwasher in a restaurant. (Tr. 209, 217.) Between 2007 and 2012, he worked as an automotive detailer at a car wash. (Tr. 47, 209, 217.) Plaintiff moved to Minnesota in 2012. (Tr. 464.) After he moved, there is no record of his employment until 2014, when he worked as a physical therapist assistant and as a cleaner at a baseball stadium. (Tr. 39–40.)

Plaintiff was twenty–six years old on November 6, 2012, his alleged disability onset date. (Tr. 39, 71, 204.) Initially, Plaintiff alleged that he was disabled due to sickle cell anemia. (Tr. 71, 90–91, 208.) Later, however, he testified at his video hearing that sickle cell anemia does not preclude him from work. (Tr. 56.) On appeal, he argues that severe mental and intellectual impairments preclude him from work. (Pl.'s Mem. 11–12, 27.)

Plaintiff's medical history shows a history various mental health issues, including Posttraumatic Stress Disorder ("PTSD")[2], depression, and anxiety. On September 26, 2013, Plaintiff presented to Family Life Mental Health Center ("Family Life") and was urged to "come into the hospital." (Tr. 388.) Plaintiff took that advice and sought treatment for depression, suicidal ideation, and hallucinations at the Mercy Hospital Emergency Department. (Tr. 371, 397.) He reported a long history of depression that had worsened in severity. (Tr. 371.) He was transferred to United Hospital Behavioral Health Service Unit ("United") and placed on a 72-hour hold because he had reported auditory hallucinations telling him to harm himself or others. (Tr. 371, 373, 380, 397.)[3]

During the 72-hour hold at United, Plaintiff reported symptoms of PTSD, depression, and anxiety. (Tr. 385.) In addition, he reported that he had been diagnosed

---

[2]    Plaintiff's PTSD symptoms stem from childhood abuse. (*See* Tr. 598.)

[3]    During the 72-hour hold, Plaintiff was diagnosed with "Cannabis abuse" and reported that he uses marijuana on a regular basis. (Tr. 384, 388–89.) Less than two weeks later, when he sought treatment for seizures, he denied any use of marijuana despite testing positive for Tetrahydrocannabinol ("THC"). (Tr. 407.)

with (1) PTSD; (2) bipolar disorder; and (3) Attention Deficit Hyperactivity Disorder ("ADHD"). (Tr. 387.)  Medical notes made during his hospital stay indicate that Plaintiff did "not describe any true bipolar symptoms other than having extensive mood swings." (Tr. 388.) His discharge record notes, however, that he appeared to be "somewhat psychotic." (Tr. 386.) Plaintiff denied any panic attack symptoms. (*Id.*) A mental status examination during his 72-hour hold indicated that Plaintiff had "average intelligence." (Tr. 385, 389.) Plaintiff was discharged on September 30, 2013, with a diagnosis of "mood disorder, not otherwise specified," "Cannabis abuse," "Seizure disorder," "[s]tressors of moving to the Minneapolis-St. Paul area with poor social support," and a GAF score of 50. (Tr. 384.) During his discharge examination, "[h]e was motivated to continue follow-up with outpatient therapy and psychiatry at Family Life, and thus . . . was able to be discharged to follow up with these recommendations." (Tr. 386.)

Plaintiff continued treatment at Family Life from October 2013 to March 2014. In October 2013, the diagnosis summary listed several issues including: posttraumatic stress disorder; schizophrenia; chronic undifferentiated-provisions; borderline level intellectual functioning-rule out; and seizure disorder-unspecified. (Tr. 416.) Medications kept his seizures under control. (Tr. 434.) The goal in October, and throughout his treatment, was to assist Plaintiff in managing his PTSD symptoms. (Tr. 445, 447, 449, 451, 453, 455, 457, 459.) Treatment included psychotropic medications, such as Zoloft, Prazosin, and Vistaril. (Tr. 466.) From October 2, 2013 through November 20, 2013, Plaintiff sought weekly treatment for his depression and anxiety. (Tr. 332, 416, 418, 420, 445, 447, 449.) His treatment for depression and anxiety was then sporadic from December 5, 2013

through March 21, 2014. (Tr. 451, 453, 455, 457, 459, 461, 463.) Plaintiff's treatment providers maintained that Plaintiff had PTSD throughout his treatment. (Tr. 416, 418, 420, 445, 447, 449, 453, 455, 457, 459, 461, 463.)

On January 24, 2014, Plaintiff had an initial office visit with Dr. M. Orhan Ucer at Health Partners Regions Hospital ("Health Partners") for depression, anxiety, and PTSD treatment. (Tr. 589–90.) Dr. Ucer indicated that the PTSD diagnosis was "related to previous abuse" (Tr. 598), and stated that for "his depression/anxiety/stress issues [the plan will be] he will continue to follow with his psychiatrist" (Tr. 599), which he did with Family Life until March 21, 2014. (Tr. 461.) Meanwhile, Plaintiff received a Psychiatric Evaluation at Family Life on February 20, 2014. (Tr. 463.) The report limits his diagnosis to PTSD and depression. (*Id.*) This report states that Plaintiff's "[i]ntelligence seems to lie in the low range, based on fund of knowledge, use of language and educational achievements." (*Id.*) This evaluation, however, did not include the reference to "borderline level intellectual functioning-rule out" as part of the diagnosis. (*Id.*) Plaintiff's treatment plan, following this visit, was to continue to "target PTSD, depression and anxiety." (Tr. 466.)

On June 1, 2015, three days after his video hearing with the ALJ, Plaintiff underwent a consultative examination at Nystrom & Associates, Ltd. (Tr. 26, 609.) Plaintiff was referred by his attorney for an assessment relating to Plaintiff's application for DIB. (*Id.*) Doctoral Intern, Kristen Lane, MA, ("Lane") conducted the examination, which was also adopted and signed by Dr. Heather Bodurtha. (Tr. 26, 619.) The purpose of the assessment was to evaluate Plaintiff's "cognitive functioning, obtain clarification

6

on his mental health diagnosis, and evaluate his adaptive functioning." (Tr. 609.) Lane administered (1) a clinical interview; (2) the Wechsler Adult Intelligence Scale, Fourth Edition ("WAIS–IV") test; (3) the Beck Depression Index, Second Edition ("BDI–II") test; (4) the Beck Anxiety Index ("BAI") test; and (5) the Adaptive Behavior Assessment System, Second Edition ("ABAS–II"). (Tr. 26, 613.) The record appears to indicate that the assessments were administered on June 1, 2015, and the results of the WAIS–IV, BDI–II, BAI, and ABAS–II were obtained on June 22, 2015. (Tr. 609, 613.)

During the clinical interview, Plaintiff relayed that he had been diagnosed with PTSD, anxiety, borderline IQ, and ADHD. (Tr. 609.)[4] In addition, he reported that he had been physically and verbally abused as a child by his mother. (Tr. 610, 612.) He also reported "mania/hypomania symptoms," such as manic episodes lasting 2–3 weeks, "feeling on top of the world," "engaging in risky behavior," and feeling "either really high or really low." (Tr. 612.) He also "reported symptoms that are consistent with posttraumatic stress disorder," such as talking about his alleged childhood abuse "all the time" that he cannot control, having flashbacks and nightmares, and "feeling like the thoughts and memories of his abuse will be in his head forever." (Tr. 612.)

Based on the clinical interview and reviewing testing data, Lane concluded that Plaintiff met the "criteria for Schizoaffective Disorder Bipolar Type, Panic Disorder, Posttraumatic Stress Disorder and Intellectual Disability, Moderate, Provisions."

---

[4]     Plaintiff denied any legal history or street drug use. (Tr. 610–11.) In addition, he reported that he had never previously attempted suicide. (Tr. 611.) However on October 2, 2013, Plaintiff reported previous suicide attempts to Family Life. (Tr. 332.)

(Tr. 616.) Her assessment of schizoaffective disorder was based on (1) Plaintiff's reports of "depressive symptoms," such as "feeling down" and being irritated; (2) a BDI–II rating of 42, which suggested a severe level of depression; (3) his reports of mania symptoms; and (4) Plaintiff's descriptions of auditory hallucinations and paranoia. (Tr. 616–17.) In Lane's view, Plaintiff also met the criteria for panic disorder based on (1) his reports of anxiety, such as irritability, "poor sleep," being "jittery," and having "racing thoughts"; and (2) a BAI rating of 29, which suggested a moderate level of anxiety. (Tr. 617.) And, Lane offered diagnostic impressions of Plaintiff's PTSD, based on childhood abuse." (Tr. 612.) Lane did not refer to any historical medical records.

Lane also diagnosed Plaintiff with "intellectual disability, moderate, provisional" based on (1) WAIS–IV results "in the extremely low range"; and (2) ABAS–II[5] results indicating that Plaintiff was significantly more dependent on the other adults in his environment to meet daily needs than most other adults his age. (*Id.*)[6] Lane recognized that the validity of her conclusions was limited by the "quantity and quality of the available information and the impossibility of absolute predictions." (Tr. 619.)[7] Plaintiff

_____

[5]     The ABAS–II assessment was completed solely by Plaintiff's girlfriend. (Tr. 615.) The ABAS–II ostensibly collects information about an individual's self–help skills and ability to function independently. (Tr. 615, 617.)

[6]     Lane added "provisional" to the diagnosis because (1) it was unclear if Plaintiff's alleged intellectual disability "started during his developmental stages, [because] previous school records were not available"; and (2) "it cannot be determine [*sic*] if his low IQ score could be related to his past physical abuse." (Tr. 618.)

[7]     Lane noted at the end of her report:

(Footnote Continued on Next Page)

8

relies on his assessed full scale IQ score of 48 ("IQ Score") to support his disability

claim. (Pl.'s Mem. 11–12, 13–14; *see also* Tr. 613.) This IQ Score is the only IQ score in

the record. (Tr. 613.)

### III.    The ALJ's Findings and Decision

In his decision dated October 8, 2015, the ALJ denied Plaintiff's application for

DIB, finding that Plaintiff was not disabled as defined by the Social Security Act.

(Tr. 29.) The ALJ proceeded through the five–step evaluation process provided in the

social security regulations. *See* 20 C.F.R. § 404.1520(a)(4). These steps are as follows:

(1) whether the claimant is presently engaged in "substantial gainful activity";

(2) whether the claimant is severely impaired; (3) whether the impairment meets or

equals a presumptively disabling impairment listed in the regulations; (4) whether the

claimant can perform past relevant work; and, if not, (5) whether the claimant can

perform other jobs available in sufficient numbers in the national economy. 20 C.F.R.

§ 404.1520(a)(4)(i)–(v).

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful

activity since April 4, 2013, the DIB application date. (Tr. 20.) Although Plaintiff worked

---

(Footnote Continued From Previous Page)
> The validity of the conclusions drawn in this report is limited by the quantity and quality of the available information and the impossibility of absolute predictions. When dealing with reports based on psychological tests, the reader needs to bear in mind that the imperfect validity and reliability for psychological testing means that these tests sometimes err, both in falsely showing conditions that are not present and in failing to show conditions that in fact exist.

(Tr. 619.)

in 2014, the ALJ found that this work activity did not rise to the level of substantial gainful activity because it did not meet the minimum income threshold requirements. (*Id.*)

At step two, the ALJ found that Plaintiff's severe impairments were affective disorder and seizure disorder. (*Id.*)[8] The ALJ found that all other impairments, alleged and found in the record, are either non–severe or not medically determinable. (Tr. 20.) Since the ALJ determined that Plaintiff had severe impairments, he continued to step three of the analysis, where a claimant must show that his impairment or combination of impairments meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. § 404.1520(a)(iii). In examining Plaintiff's impairments, the ALJ reviewed the Listing of Impairments, specifically Sections 11.02 and 11.03 (seizures); Section 12.04 (affective disorders); and Section 12.05 (intellectual disability). (Tr. 21.) The ALJ found that the evidence did not meet the criteria for these Listings. (*Id.*)

Regarding Section 12.05 of the Listings (which is at issue in Plaintiff's appeal), the ALJ found that the severity of Plaintiff's alleged mental impairments, "considered singly and in combination," did not "meet or medically equal the criteria of" Section 12.05. (Tr. 21.) On appeal, Plaintiff argues that the IQ Score satisfies the "paragraph B" criteria of Section 12.05 because it is a valid full scale IQ score of 59 or less. (Pl.'s Mem. 13–14.) The ALJ found that the IQ Score was not valid, because (1) Plaintiff "gave up

---

[8]     On appeal, Plaintiff does not contest the ALJ's analysis of these two severe impairments, or the RFC resulting from these two impairments.

easily during the subtests"; (2) Lane did not assess the IQ Score's validity – "specifically, she did not note that she believed the test scores to be a valid measurement of the claimant's IQ"; and (3) Lane did not recommend follow–up regarding the IQ Score. (Tr. 27.) The ALJ also assigned little weight to Lane's entire opinion and report, including the IQ Score, because it was based on Plaintiff's "inconsistent reports and presentations in [the] examination, different from many other allegations in the record." (Tr. 22, 27.) Specifically, the ALJ noted (a) Plaintiff reported "far more extensive" symptoms of manic episodes, depressive episodes, and auditory hallucinations that differed from Plaintiff's testimony at the video hearing; and (b) Plaintiff denied any legal history, which differed from his testimony at the video hearing. (*Id.*) Consequently, the ALJ determined that Plaintiff did not satisfy the criteria of Section 12.05 and thus, did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 21–22.)

Before considering step four, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels subject to the following non–exertional limitations:

> The claimant cannot climb ladders, ropes, or scaffolds and he cannot be exposed to hazards such as dangerous machinery or unprotected heights. The claimant is limited to routine, repetitive, 3–4 step tasks involving only brief, superficial contact with co–workers and reasonably supportive supervisory styles. The claimant cannot do work requiring adherence to strict or fast–paced production demands.

(Tr. 23.) In determining Plaintiff's RFC, the ALJ analyzed Plaintiff's symptoms using the two–step process: (1) whether Plaintiff's medical impairment could reasonably be expected to produce his symptoms, and (2) the extent to which the symptoms limit the claimant's functioning. (*Id.*) The ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible[.]" (Tr. 26.)

In making the RFC determination, the ALJ afforded great weight to the opinions of the state agency medical consultants because their "opinions [were] consistent with the objective medical evidence in the record." (Tr. 27.) By contrast, the ALJ afforded little weight to the opinion of Lane, because "the claimant gave inconsistent reports and presentations" during the consultative examination. (*Id.*) The ALJ found the information reported to Lane was "different from many other allegations in the record," and it "provided only a snapshot of the claimant based on the claimant's reports and behavior only on that day." (*Id.*)

At step four, the ALJ found that Plaintiff did not have past relevant work. (Tr. 27); *see* 20 C.F.R. § 416.965. At step five, the ALJ found that jobs exist in significant numbers in the national economy that Plaintiff can perform given his age, education, work experience, and RFC. (Tr. 28.) The ALJ relied on the vocational expert's testimony that, given these factors, a person would be able to perform the requirements of occupations such as housekeeping cleaner, advertising material distributor, and laundry worker II. (*Id.*) Accordingly, the ALJ found that Plaintiff was capable of making a

successful adjustment to other work existing in significant numbers in the national and state economies, and concluded that Plaintiff was not disabled from his alleged onset date through the date of the decision. (Tr. 28–29.)

## DISCUSSION

### I.    Standard of Review

Congress has established the standards by which Social Security disability insurance benefits may be awarded. The SSA must find a claimant disabled if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). The claimant bears the burden of proving that he is entitled to disability insurance benefits under the Social Security Act. *See* 20 C.F.R. § 404.1512(a). Once the claimant has demonstrated that he cannot perform past work due to a disability, "the burden of proof shifts to the Commissioner to prove, first that the claimant retains the [RFC] to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to do." *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000) (citations omitted).

The Court has the authority to review the Commissioner's final decision denying disability benefits to Plaintiff. 42 U.S.C. § 405(g); *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). If the Commissioner's decision is supported by substantial evidence in the record as a whole, then the decision will be upheld. 42 U.S.C. § 405(g); *Kluesner*, 607 F.3d at 536 (citations omitted). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). This standard is "something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994). The Court thus considers both evidence that supports the Commissioner's decision and evidence that detracts from it. *Kluesner*, 607 F.3d 536. If, after review, the record as a whole supports the Commissioner's findings, the Commissioner's decision must be upheld, even if the record also supports the opposite conclusion. *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008); *Goff v. Barnhart* 421 F.3d 785, 789 (8th Cir. 2005).

## II.    Analysis of the ALJ's Decision

### A.    The ALJ did not err in finding that Plaintiff's assessed full scale IQ score of 48 was not valid.

Section 12.05 defines an intellectual disability as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.* the evidence demonstrates or supports onset of the

impairment before age 22." *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. A plaintiff

who is found to be intellectually disabled under Section 12.05 "is presumed disabled at

step three without further inquiry." *Christner v. Astrue*, 498 F.3d 790, 793 (8th Cir.

2007). A finding of presumptive disability under Section 12.05(b) requires a "valid,

verbal, performance, or full scale IQ of 59 or less." *See* 20 C.F.R. Pt. 404, Subpt. P, App.

1, § 12.05; *Christner*, 498 F.3d at 793; *Muncy v. Apfel*, 247 F.3d 728, 731 (8th Cir. 2001).

Plaintiff argues that the ALJ erred at step three of the analysis because the IQ

Score derived from Lane's consultative examination was valid and establishes his

presumptive disability pursuant to Section 12.05(b). (Pl.'s Mem. 13–14.) He contends

that the ALJ erred in discrediting the IQ Score, and cites *Christner* in support of a remand

to the ALJ for further consideration of Section 12.05. (Pl.'s Mem. 13–14, 17.)

In *Christner*, the social security applicant argued that he met the requirements of

Section 12.05(b) because he had a valid full scale IQ score of 58. 498 F.3d at 793. The

Eighth Circuit remanded the case to the ALJ for reconsideration because it was unclear

whether the ALJ had expressly rejected the plaintiff's IQ score. *Id.* at 794 ("Accordingly,

because it is unclear to us whether the ALJ expressly rejected Christner's IQ score . . . we

remand to the ALJ for reconsideration."). Here, the ALJ expressly rejected Plaintiff's IQ

Score in his decision, stating "I find the full-scale IQ score of 48 is not valid." (Tr. 22,

27.) The record in this case is therefore distinguishable from *Christner*.

"It is undisputed that '[t]he Commissioner is not required to accept a claimant's IQ

scores . . . and may reject scores that are inconsistent with the record." *Miles v. Barnhart*,

374 F.3d 694, 699 (8th Cir. 2004) (citing *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir.

1998)); *Hines v. Astrue*, 317 Fed. App'x 576, 579 (8th Cir. 2009) ("An ALJ, however, 'is not required to accept a claimant's IQ scores . . . and may reject scores that are inconsistent with the record.") (citing *Miles*, 374 F.3d at 699). Further, as the Eighth Circuit discussed in *Christner*, the "ALJ may disregard a claimant's IQ score when it is derived from a one-time examination by a non-treating psychologist, particularly if the score is inconsistent with the claimant's daily activities and behavior." 498 F.3d at 793–94 (citing *Muncy*, 247 F.3d at 733); *see also Clark*, 141 F.3d at 1256 (stating that low IQ scores that are the product of the first and only meeting with an examiner may be discredited because a "one-time evaluation by a non-treating psychologist is not entitled to controlling weight.").

Plaintiff does not dispute that his IQ Score was derived from Lane's one-time evaluation of Plaintiff. (Tr. 27, 609, 613; *see generally* Pl.'s Mem.; *see also* Def.'s Mem. 5 ("Plaintiff's IQ scores were based on his first and only meeting with Dr. Bodurtha, whose opinion was not entitled to controlling weight.").) And, as identified by the ALJ, the "consultative examination provided only a snapshot of the claimant based on the claimant's reports and behaviors only on that day." (Tr. 27.) In finding his full-scale IQ score invalid, the ALJ stated that "the claimant gave up easily during the subtests and the administrator of the test did not assess the scores validity." (*Id.*) "Specifically, she did not note that she believed the test scores to be a valid measurement of the claimant's IQ" and "she did not recommend any follow-up regarding the IQ scores." (Tr. 27, 619.)

16

Additionally, "she did not believe the claimant would be precluded from work." (Tr. 27; *see also* Tr. 619.)[9]

The ALJ's decision to discredit Plaintiff's IQ Score is also "supported by substantial evidence on the record as a whole." *Hines*, 317 Fed. App'x at 579 (citing *Clark*, 141 F.3d 1255). As identified by the ALJ, "the claimant gave inconsistent reports and presentations in this examination, different from many other allegations in this record." (Tr. 27.) Thus, "[d]ue to the inconsistencies on which this opinion is based, [he gave] it little weight." (*Id.*) Specifically, regarding his mental health, at his video hearing Plaintiff reported (1) "having issues with anger"; (2) taking medications for anxiety in low doses; and (3) having difficulty sleeping due to nightmares. (Tr. 27, 48, 51.) However, he reported "far more extensive" allegations of "manic episodes, depressive episodes, and auditory hallucinations" three days later to Lane. (Tr. 27, 616–18.) The ALJ also noted that Plaintiff's denial of alcohol or drug use was inconsistent with the

---

[9]    Lane provided recommendations regarding attention and concentration issues, including references that could relate to work. This includes:

  a.  Have a schedule, review materials frequently, organize materials and work space, have large projects broken down into smaller segments, and allow for breaks.
  b.  Work in a quiet distraction-free environment.
  c.  Use reminders and calendars.
  d.  Audio record important information.
  e.  Ask others to help him understand information and/or repeat information.
  f.  Provide information in a one step at a time pattern.
  g.  It may be helpful to observe others completing a task for demonstration.

(*Id.*)

record. (Tr. 26.) For these reasons, the ALJ determined that the IQ Score was inconsistent with the record as a whole, and was not valid. (Tr. 27.)

Furthermore, the IQ Score is inconsistent with other medical evidence in the record. First, the IQ Score indicating that Plaintiff was in "the extremely low range" of WAIS-IV assessments is inconsistent with Plaintiff's report that he "was an A and B and C student while in school." (Tr. 389.) It is also inconsistent with Family Life's records indicating that Plaintiff had "average intelligence." (Tr. 385); *see Miles*, 374 F.3d at 699 ("It is undisputed that '[t]he Commissioner is not required to accept a claimant's IQ scores . . . and may reject scores that are inconsistent with the record.'"); *Hines*, 317 Fed. App'x at 579 (stating that if the ALJ's decision to discredit a plaintiff's IQ score "is supported by substantial evidence on the record as a whole," then the Court "must affirm").

The Court finds that the ALJ's reasons for disregarding the IQ Score were not erroneous, and substantial evidence in the record as a whole supported discounting Lane's report, which included the IQ Score. Therefore, the ALJ's finding that Plaintiff did not establish presumptive disability pursuant to Section 12.05 at step three of the analysis is affirmed. *See Vance v. Berryhill*, 860 F.3d 1114, 1120 (8th Cir. 2017) (stating that "[t]he ALJ reasonably found, based on the record as a whole," that the claimant did not meet the requirements of Section 12.05); *see also Ash v. Colvin*, 812 F.3d 686, 689 (8th Cir. 2016) ("Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.") (quotations omitted).

18

**B.    The ALJ did not err in finding that the four additional alleged impairments were not severe impairments.**

Plaintiff argues that the ALJ erred at step two by failing to identify the following four additional impairments as severe: (1) schizoaffective disorder, bipolar type; (2) panic disorder; (3) PTSD; and (4) intellectual disability, moderate, provisional. (Pl.'s Mem. 27.) In support, Plaintiff relies on Lane's report and Family Life's diagnostic assessment on October 2, 2013. (*Id.*)

"An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007) (citing *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987); *id.* at 158 (O'Connor, J., concurring); 20 C.F.R. § 404.1521(a)). "If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two." *Id.* (citing *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007)). "It is the claimant's burden to establish that his impairment or combination of impairments are severe." *Id.* (citing *Mittlestedt v. Apfel*, 204 F.3d 847, 852 (8th Cir. 2000)). Severity is not an onerous condition for the claimant to meet, *see Hudson v. Bowen*, 870 F.2d 1392, 1395 (8th Cir. 1989), "but it is also not a toothless standard[.]" *Kirby*, 500 F.3d at 707.

The ALJ reviewed all of the alleged impairments and determined that only two were severe: (1) affective disorder and (2) seizure disorder. (Tr. 20.) He explained why:

> I find that all impairments other than those enumerated above, alleged and found in the record, are non-severe or not medically determinable as they have been responsive to treatment, cause no more than minimal vocationally relevant limitations, have not lasted or are not expected to last at a "severe" level for a

continuous period of 12 months, are not expected to result in death, or have not
been properly diagnosed by an acceptable medical source.

(Tr. 20.)

For the reasons already stated above, the ALJ properly concluded that Lane's

report should be given little weight. It is well established that "the opinions of one-time

examiners and non-examining consultants generally do not constitute substantial

evidence in the record as a whole[.]" *Weber v. Colvin*, No. 16-CV-332, 2017 WL 477099,

at *27 (D. Minn. Jan. 26, 2017) (citing *Teague v. Astrue*, 638 F.3d 611, 615 (8th Cir.

2011) ("A single evaluation by a nontreating psychologist is generally not entitled to

controlling weight."); *Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999) ("The opinion

of a consulting physician who examines a claimant once or not at all does not generally

constitute substantial evidence."); *Clark*, 141 F.3d at 1256 ("A one-time evaluation by a

non-treating psychologist is not entitled to controlling weight.").

Lane's opinion is the only evidence in the record indicating a diagnosis of

(1) schizoaffective disorder, bipolar type; (2) panic disorder; or (3) intellectual disability,

moderate, provisional. The ALJ determined that these diagnoses were inconsistent with

other medical evidence in the record. For example, Lane's diagnosis of panic disorder is

inconsistent with Plaintiff's reports to United where he "denied any panic attack

symptoms" during his 72-hour hold. (Tr. 388.) Further, his allegation that any panic

disorder impairment should have been classified as severe is belied by the Lane report

itself. Lane discusses that her anxiety assessment suggested only a "moderate level of

anxiety." (Tr. 615.) Lane's diagnosis of intellectual disability, moderate, provisional is

inconsistent with United's record that Plaintiff had "average intelligence." (Tr. 385, 389.) And, it is also inconsistent with Plaintiff's report that he "was an A and B and C student while in school." (Tr. 389.)

In assessing Plaintiff's PTSD—along with schizoaffective disorder, panic disorder and intellectual disability—as the ALJ pointed out, the  "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in [the] decision." (Tr. 26.) As discussed above, some of Plaintiff's reports to Lane were inconsistent with his reports to the ALJ at the hearing and elsewhere in the record. And, while Plaintiff was diagnosed with PTSD on October 2, 2013, ample evidence supports the ALJ's conclusion that his PTSD was not severe. Even Lane's list of symptoms associated with Plaintiff's PTSD does not detract from the ALJ's findings. (Tr. 617 ("[H]e talks about his past abuse all of the time, irritability, constant thoughts about the abuse he cannot control, startles easily, loud noises make him very mad, gets flashbacks, and gets nightmares.").) Finally, all four alleged additional severe mental impairments—specifically the alleged severity of each—are inconsistent with Family Life's finding that Plaintiff did not have "a serious and persistent mental illness." (Tr. 335.)

Thus, substantial evidence in the record as a whole supports the ALJ's findings at step two. *See Kirby*, 500 F.3d at 709. And the ALJ permissibly found that Plaintiff's other impairments were not severe.

## ORDER

Based on the foregoing, and all the files, records, and submissions herein,

**IT IS HEREBY ORDERED** that:

1.    Plaintiff's Motion for Summary Judgment (Doc. No. 11) is **DENIED**;

2.    Defendant's Motion for Summary Judgment (Doc. No. 15) is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Date: March 23, 2018.                          *s/ Becky R. Thorson*_____
                                               BECKY R. THORSON
                                               United States Magistrate Judge